v. Anadarko Petroleum Corporation. Mr. Orsini. Good morning, Your Honor. May it please the Court. Kevin Orsini for Anadarko. Can the Court hear me okay? I've got a little bit of a voice issue today. I apologize. The key issue below in this securities litigation was what caused the stock price drop for Anadarko Securities on May 3rd. Under the burden-shifting framework in Basic v. Levinson, in our opposition brief on class certification, we put forth expert evidence that established it was not the alleged fraud. Because what had happened was on May 2nd, there were two disclosures. One was that an explosion in Colorado that had unfortunately killed an individual was tied to a well that Anadarko had owned and operated. And that as a result of that, there would be a massive regulatory process to make sure that didn't happen again. Ultimately resulted in shutting down 3,000 wells. Plaintiff's expert below agrees that disclosure had some, some price impact. On reply, plaintiffs came in with an entirely new set of expert analyses from their expert. As is always the case these days it appears in these securities litigations under Basic, the opening brief on class cert said nothing about the price impact issue. So we put in our evidence on opposition. On reply, they had entirely new expert analyses and entirely new expert opinions and evidence that they submitted established at least some price impact from the alleged fraud. The reason we're here today, your honor, and your honors is because what the court below didn't do was what Justice Barrett says you have to do on price impact and that was in Goldman Sachs. And the directive from the Supreme Court was consider all probative evidence. And here we submit that the district court abuses discretion in three interrelated ways. The first was we asked for an opportunity to put in a cert reply. This case had an interesting procedural history. Judge Estridge was actually the third district court judge assigned to this case for reasons that I don't think are really relevant but it moved around. In the original scheduling order that was entered by a prior judge, class certification would be briefed in three briefs and then there was to be a hearing. Ultimately a hearing was not held. We asked for the opportunity to submit a cert reply brief. The court denied that right. We believe that is an abuse of discretion under this court's ruling in residence of Gordon Plaza, which I know your honor was one of the authors of, because what the court did was rely on new evidence submitted in reply and never gave us an opportunity to respond. So a cert reply would have been one way to permit us to actually respond to new evidence and arguments that were submitted for the first time in reply. The second way in which we believe that the court abuses discretion was after the denial of the cert reply request, we filed a Daubert motion. There's no dispute, and there can be no dispute, that we have the right to file that. There's no dispute under this circuit's law in the Prantel decision from 2022 that at class certification the court has to do a full-fledged Daubert analysis. And as it relates to the class certification piece, we believe the court below abuses discretion by not considering the evidence and arguments made in the Daubert motion as it related to class certification. And we know the court didn't do that, because the court has told us that. So it seemed fairly clear from the original class certification decision that the district court didn't consider the arguments set forth in the Daubert motions when actually looking at this price impact. And we submit that also is in contravention of the directive from Justice Barrett and Goldman Sachs. When we filed our motion for reconsideration, which is in the record on appeal, the district court said explicitly that most of the arguments we were presenting on reconsideration were initially raised in our Daubert motion and would not, the district court actually emphasized the word not, be properly considered on class certification. And we believe that's an abuse of discretion as well. We had the right to file the motion. The evidence was before the court. Goldman Sachs says you have to consider all probative evidence. The court explicitly said it didn't. All right, so let's talk about the reply-sir-reply issue. Yes. First of all, without forecasting what we would do, it is somewhat of an uphill battle you have, right? Normally we don't get into whether district courts grant sir-replies or not. That's about saying we would never reverse on that ground, but you acknowledge it's a lot of discretion we give district courts. I do agree, Your Honor, that it is absolutely in the discretion of the district court whether or not to grant sir-replies. There's no question about that. But I do believe it is also the right of others that when there are new evidence and new arguments presented in a reply that the district court then relies on, which he unambiguously did here, then it is an abuse of discretion. Well, I suppose the district court could ignore the new evidence. Your Honor is exactly right. He didn't do that. He has two options, and this is actually the Baird case out of the Tenth Circuit, where what the court said was, look, if you get something new on reply— Ignore it or give process. Precisely, Your Honor. So let's talk about whether it's new. To me, what's most interesting, and perhaps you find something else more interesting, to me it's the aftermarket trading aspect. Yes, Your Honor. So talk to me about that aspect. So I think there were two things that were new, Your Honor. There is the aftermarket trading analysis, and then there's also— The event study. The event study. Exactly right. And what the appellees point out is that the district court said, I'm not going to rely on the event study, or even without the event study. There's still plenty here for me to deny this argument on price impact. The court does actually cite the event study, but on the price impact analysis. It was absolutely new. I mean, there's no argument that the plaintiff's expert had presented that analysis in his opening report. He didn't, because as we always see in these securities cases, they didn't address price impact. What I think the new argument really boils down to is a bit of semantics, and I don't mean that sort of in a snarky or pejorative way, but the argument that appellees make is, well, it was responsive to the arguments that you made in opposition, and therefore it can't be new. Well, the reality is, first of all, it's not just arguments. As Your Honor noted, it is a price impact analysis. These are all elements that are on them to prove— Exactly right. And it is an entirely new piece of expert evidence that the court unambiguously relied on in denying class certification. Can we get more specific, though? Yes, Your Honor. Because I'm curious. Where I'm going, I guess, is sort of, you know, was this a harmless error to deny use or apply, or did you have something substantive to talk about? And so as I understand the aftermarket trading—you obviously know the details better than I—essentially what they're saying is the aftermarket trading shows that—let me see here—aftermarket at 4.16 p.m., Shenandoah's disclosed. 4.51 p.m., Colorado's disclosed. And guess what? Stock is falling even before Colorado's announced, so this ain't about Colorado. It's about Shenandoah. What are you going to say about that if you were granted this overprice? Right. So we have a couple of things to say about that. The first— I understand. We don't want to—we don't want to remand if there's nothing, you know, interesting that's going to happen. I totally understand that. And plenty of interesting things have happened, and it's all in the background, would be presented on Class Search. So there are a couple of responses. First of all, the timing is off. What Your Honor just described in terms of the chronology that Shen comes out first at 4.16 and Firestone, Colorado, comes out at 4.50-ish, that's actually not entirely accurate. What happened was there were tweets that went out at around 4.02 p.m. that disclosed that there was going to be a Sheriff's Office press conference starting immediately with respect to the report of what happened in Colorado. And so while the media reports are ultimately published closer to 4.50 about what the Colorado investigators are saying, the press conference starts before the Shen disclosure. Now what they say is, but your expert said that Shen was at 4.16 and Colorado was at 4.50, and they're right. Our expert did lay out that timeline without pointing to the 4.02 disclosure, but that's because our expert provided that as sort of atmospherics. It was a mistake. He missed in his report the fact that there was the 4.02 disclosure, but it didn't... Let me make sure I understand. So you're saying there are news articles printed, put online I guess, at 4.51, but those news articles are covering a live press conference that was happening in the hour before, and this was something that people could have at least in theory seen. Do you have any evidence that people were actually watching it as opposed to... Anybody know about this until 4.51? We do see evidence that there is some movement in the aftermarket price, whether we have... But they say it's because of Shenandoah. They say it's because of Shenandoah. We say it's not, and I'll get back to that. Can I point to a specific article where it says... Was anybody in the room listening to this press conference who would have been able to affect the market, or is it just the news articles? So on that point, Your Honor, I don't have a specific piece of record evidence I could point to that says Goldman Sachs was watching the press conference and engaged in a big trade. I don't have that. But what we do have and what we would present and did present in the Daubert motion beyond this chronology issue are two other key points. First of all, a price impact analysis only works in an efficient market. You can only provide support that value-relevant news is moving the price of a security if you can establish that the market is efficiently absorbing that news. And their expert has conceded that he did not do any analysis as to whether aftermarket trading was itself efficient. He's also conceded... Sounds like a facial attack on the whole aftermarket trading presentation. Yes, we have a facial attack on their entire analysis. None of this should all be thrown out as far as you're concerned. We believe it's completely unreliable. We believe it's not something that ever would be admissible at trial. And we believe, therefore, it should have been and could be thrown out on Daubert. And it certainly is something that needs to be considered, all of those critiques, that is. All of our critiques have to be considered in the class certification decision as the court weighs the evidence. The court didn't do that. He didn't look at that evidence explicitly. The final point I'll make, Your Honor, additional evidence we have as to why the aftermarket trading, especially given that it's not an efficient market, is insufficient to establish price impact is there's this criticism that we didn't do an event study in Mr. Farrell's or Dr. Farrell's opposition report. I counted them last night on the plane ride down. We did 13. We did 13 event studies. What we didn't do is the flawed event study, which I understand is a separate analysis from Mr. Steinholt, but the event studies that our expert did do, and as he points out, in the Daubert motions that were not considered, the Daubert reports that were not considered, the Sir Reply report that we were not entitled to file, is that when you actually take those event studies and you correct the flawed event study that was provided by Mr. Steinholt for the first time on reply, it shows that on May 3rd, on May 3rd, what company's stock prices move, the ones with massive exposure in Colorado, what company's stock prices don't move are partners in the Shen exploration. And that also, while they are two separate analyses, I grant you that, the aftermarket trading versus the event study, they are both probative of the reliability of that aftermarket's analysis and the extent to which that actually provides probative evidence supporting price impact. I see I have a few more minutes, but subject to further questions from the Court, I can sit down. Thank you. You have reserved five minutes. Mr. Daly. May it please the Court, Joseph Daly for the Lee Plaintiff's Appellees. This morning I'm going to address two central issues presented. First, the District Court's discretion in denying defendants a surreply, given its express finding that the plaintiff's reply didn't introduce new arguments, but instead squarely responded to the defendant's opposition. And second, the District Court's ultimate conclusion following its survey of extensive record evidence that the defendants failed to carry their burden of disproving price impact for Anadarko Stock. Now the first issue, the general rule is that a surreply is justified when a party introduces new arguments for the first time on reply. But a corollary to that general rule is that when the reply doesn't introduce new arguments, but merely responds to arguments raised in the opposition, there's no need for a surreply. And that's exactly what the District Court expressly found here, that plaintiff's reply, quote, squarely responded to arguments in the opposition, but the reply, quote, didn't introduce new arguments or evidence, end quote. So those findings are deferred to by this Court unless they're clearly erroneous. And the record supports the fact that these are not clearly erroneous, because on their — in their opposition, the defendants raised two key arguments on price impact. But isn't it different, though, when we're talking about a reply that responds — it is responsive, but it's also responding with new evidence that wasn't presented in the opening? But that — Isn't that different? That presumes that what was discussed in reply is actually, quote, new evidence. That's their point. We disagree vehemently with that. Expose you a case like this case, where plaintiff has the burden of proving two elements. And for whatever reason, the plaintiff only focuses on element one. On the opposition, they contest elements one and two. And the reply, all of a sudden, oh, I'll gauge on element two for the first time with evidence that — that they had never heard before. But under your — Wouldn't that naturally require a reply? Under your scenario, the opposition raised two points instead of the one that came in on the — on the movement's initial brief. And therefore, the reply is allowed to respond. Well, but if the plaintiff has the burden to prove two elements — Mm-hmm. — for whatever reason, just doesn't address the second, certainly the bottom brief is allowed to say, well, it doesn't — even if we lose on the first element, we win on the second element. Well — There's nothing unnatural about that. No, there's not. But let's — the context in this case, and I don't mean to put too fine a point on it, is, as counsel mentioned, they're — they had a huge burden here. They had a burden to sever the link between their misstatements and omissions and any price impact upon Anadarko — Anadarko stock. You would have thought that they would have come in on their opposition with an event study on Anadarko stock. It just boggles the ConocoPhillips. They came in with an event study on some other Colorado operators. And the fact that they didn't come in with an event study on Anadarko stock, we were forced to come in on reply with an event study specifically aimed at that Anadarko stock movement, using a Colorado peer group that their own expert himself had brought up in opposition. So, of course, we got excoriated for it in the motion for surreply, because we've now changed our methodology. Nothing changed. The only thing that changed were the inputs into the methodology that had already been put in Mr. Steinholtz's original event study and his original expert report when we moved for class certification. The Daubert motion is already pending as to your expert. Isn't that correct? The Daubert motion was pending — the Daubert motion came in two months after they were directly found. That Daubert motion was a thinly disguised attempt at the surreply. So just briefly returning to the fact that the defendants are trying to flip the price impact burden. I mean, in the earlier matter before, Your Honors, you were speaking about burdens. And the burden here is very, very important. I heard counsel say something about Mr. Steinholtz didn't submit a price impact event study in our opening. We don't have to do that. That's not our burden. It's their burden to sever the link. All we had to do in our opening when we moved for class certification was show the factors, establish the factors that gave us the presumption of reliance under BASIC. And we did that. Market efficiency, the fact that misstatements and omissions were material, and that our clients traded at the relevant times. Pardon my ignorance. The event study that we're talking about, the aftermarket trading analysis, were these in the record? The aftermarket? There was no, there was no, I'm pardon me. I'm sure we're on the same page. Pardon me. I appreciate your enthusiasm. I just want to make sure we're on the same page, though. Were these documents, the aftermarket study, the event study we're talking about, were these in the record prior to the filing of your reply brief? I want to respectfully correct, Your Honor, there is no aftermarket event study. That's something counsel was complaining about. Mr. Steinholtz did not do an event study of the aftermarket trading on May 2nd. How would you describe the aftermarket study, aftermarket trading analysis? I would describe it as spot on. No, I mean, I'm sure you like it. I'm sure you think it's devastating. And for all I know, it is. That's obviously not what's before us today. You resisted the word study. I just want, can we just call it document? I don't really care what you call it. I can tell you what happened in the aftermarket study. My point is, were these, let's just address my question, though. The aftermarket trading reference. Yes. The reference to the event study. Were these in the record prior to the reply brief? The reference to the aftermarket trading was not that reference by Mr. Steinholtz. It was in response to their pointing out this. No, I understand the theory, but I just want to, as a record matter, these were introduced into the record of the case at the time of the reply? That's true. Responsive to their arguments. Pointing to this 451 Denver Post article, which, by the way, they didn't switch to the 403 until two months later. So they, we came in and showed in our reply that the stock price of Anadarko stock dropped steadily 4.1% over about 20 minutes and that Bloomberg had mentioned it twice in articles at 422 and 424, I want to say. Those Bloomberg articles and that mention of that particular stock drop forced their expert to suddenly backtrack and say, oh my God, well, no, there was a 451 Denver Post article talking about the Firestone explosion in Colorado back in April. Be that as it may, the stock, as Your Honor pointed out earlier, the stock was dropping even before that Firestone news came out of 451. Right, but as we just heard and as was discussed in the briefing as well, that was a print article that obviously documents an event that everybody is watching, or at least some people could have watched. Couple of points. Number one, there was some discussion of 402. You could watch a report of a football game where you could watch the game, right? Right, right. It was a 403 tweet. The fact of that 403 tweet didn't come out until two months later, but even before that, here's some other points about that 403 tweet. What do you mean it didn't come out two months later? Their expert didn't suddenly backtrack from 451 Denver Post to the 403 tweet. I appreciate what you're saying. What you're concerned about is that's a new piece of argumentation. That's very, very new. It's two months after. Then you get to respond to that. That's sort of the spirit of this discussion? I think when we opposed their request for a surreply and then for Daubert, we wanted a chance to respond to that, but it's in the briefs. What happened from 403 to 414, this is in our brief, it's in the record, from 403, the tweet announcing the press conference that's ongoing that Your Honor was wondering, are people in the room watching this press conference? From 403 to 414, 20 shares of Anadarko stock traded. All right, so this suddenly blockbuster Firestone news that supposedly sent investors running for the hills, nothing happened. 20 shares traded at the very same closing price. Related to that— Is there any evidence that the press conference was available to be—could it have been watched by anybody outside the room? I'm unaware of anything in the record. Perhaps it could have been. But related to that— As far as you're telling me, there's a tweet at 403 saying there's going to be a press conference. Who knows what it's going to say? Who knows if it's going to help one side or the other, but there's going to be a press conference. At 451, there's a report indicating here's what the press conference said, and it turns out to be potentially bad for these companies. For Anadarko and other Colorado operators. But two points. Number one, let's not overlook again the 4.1% stock drop in the interim, all right, which then the next day climbs to an 8% stock drop. But even more importantly, 10 days before that, in April, the Firestone—when the Firestone explosion had happened, on April 26th, Anadarko came out and said there's been an explosion at a house located some 200 feet from one of our vertical wells. Out of an abundance of caution, we are going to shut down 3,000 other vertical wells around the state. And the next day, Anadarko's stock dropped 4.7%. There's the Firestone news. There's the Firestone impact upon Anadarko's stock, not 10 days later in May, when Anadarko's stock didn't even move after this 4.03 tweet, and only started moving after the earnings report where they suddenly announced, oh my gosh, a $902 million charge, we're stopping appraisal of the entire Shen development, and by the way, our Shen 6 sidetrack well came up dry, which the analysts at the time admitted was new news to the market, and analysts also reported that, you know what, this news about Shenandoah, this is taking away the premium that we have ascribed, if that's the right word, that we have ascribed or attached to Anadarko's shares. They prided themselves on, and they had a reputation for, being very good at deep water exploration, and now that was suddenly in doubt. Now, council talked about what happened the next day on May 3rd with similarly situated partners of Anadarko undergoing these stock drops. That's not completely true. ConocoPhillips may not have moved, and we've already explained in the brief, I'm not going to belabor the point, but you know, a $60 billion market cap, a .2% effect on its market cap by the bad news, but on May 3rd, council didn't mention Cobalt. Cobalt was another partner of Anadarko. Cobalt's stock dropped 11 point something percent the next day, and guess what, Cobalt did not have a Colorado presence. Cobalt was not in Colorado, would have no effect upon its stock from any bad news happening from the Firestone explosion. So moving on now to their failure to prove price impact by a preponderance of the evidence, you know, as a threshold matter, as I've already pointed out, the defendants didn't dispute that we properly invoked the basic presumption. Their attempt to meet that burden, to rebut it by a preponderance of the evidence, centered on the premise that the Shen disclosure didn't affect Anadarko's stock one iota, but rather was the Firestone news, and that they should look to the ConocoPhillips. You know, walking across Lafayette Square this morning, I was thinking, what's an analogy? And I thought, you know what, a local analogy. It would be as if somebody had said to me, why don't you find out how the New Orleans Pelicans stack up against the rest of the NBA? And I said, okay, I'll take on that challenge. I'm going to look at the Houston Rockets and the San Antonio Spurs and look at their numbers, and I will tell you how the Pelicans, I mean, it just doesn't make sense. It boggles the mind that they did not do an event study of Anadarko. We did that event study, and your honors already know what we found out. Pardon me. Anyways, the record demonstrates that their premise is completely false. The Firestone news that first came to light in late April, Anadarko's stock dropped 4.7% the next day. We need to fast forward to May 2nd, all right, and that particular date, the minute-by-minute timing is key. At 4.16 p.m., Anadarko disclosed a $902 million write-off that it was suspending further Shen appraisal and the sidetrack well was dry. Anadarko's stock immediately started dropping. Even as I read through this part, I realize I'm repeating something we've already done extensively, but nonetheless, let's talk a little bit about what happened when confronted with that particular timeline. The defendants suddenly backtracked, and they've changed the news after class certification, pardon me, to a 403 tweet about a press conference, but that, again, doesn't account for what happened back in April. The record shows that from 403 to 415, just 20 shares of Anadarko's stock were traded, and the defendants didn't even bother to submit an Anadarko stock movement chart despite their burden to disprove the price impact. Now, when they used ConocoPhillips as a comparator to Anadarko, the district court found, and again, this is a finding that must be deferred to unless clearly erroneous, the district court correctly found that ConocoPhillips was a poor comparator. That's because on the morning of May 2nd, ConocoPhillips had issued a single sentence taking a $100 million charge for dry hole expenses, not even a $101 million charge directed strictly at Shen, but a $100 million charge for dry hole expenses that included Anadarko. Compare that, I'm sorry, that included Shen, compare that to Anadarko's $902 million write down and the suspending of appraisal and the dry hole results. Conoco had a market cap of $60 billion, the charge affected it only 0.2%, Anadarko's market cap was nearly half of that, $31 billion, and the write down that it took affected it by nearly 3%, which was 14 times the impact that ConocoPhillips felt. And ConocoPhillips had already announced back in 2015 that it was going to leave deep water exploration in the Gulf. Compare that with Anadarko's acknowledged prowess in deep water exploration that had been built into its stock premium and the analyst said that premium is now gone. If Your Honors would like, I could return to the sir reply argument. As I said there, the district court judge . . . I think we've heard the argument, but it's your four minutes, it's up to you. No, I don't want to just talk for the sake of taking up the four minutes, I do want to mention again, I want to emphasize that Judge Eskridge made specific findings in response to their sir reply motion where they charged the plaintiffs with having made, quote, new arguments and brought in new evidence, and he said no, that's not true, they responded to what you had brought up in your opposition. And you know, the Steinholt event study that our expert came in with on reply, yes it was new in one sense of the word in that it didn't exist before, but was it new in the context of sir reply litigation over whether something is truly new? No. Was it new in that . . . what would have been new if we had, for example, brought in a new date with a new stock drop? That would have been new information that the defendants did not have at their disposal. All Mr. Steinholt did was he took their opposition arguments and, pardon me, did the event study that they had failed to do, and even then Judge Eskridge said, you know what, I don't even have to look at the event study, I mean I'm paraphrasing, but he specifically pointed to 20 pages of the Steinholt rebuttal report that he said reliably shows the flaws. In terms of the sir reply issue, I guess the way I think about it is you can be responding to an argument with something that the plaintiffs had fair notice of, I'm sorry, the defendants had fair notice of, or you could respond to something with evidence that the defendants did not have fair notice of. Well, they should. The fact that it's responsive really doesn't answer the question. It's whether there was fair notice. And when the documents weren't in the record at all, as I think you've said, that at least raises a question of notice. Maybe they should have expected it. Here's what they were on notice of. Here's what they were on notice of. They were on notice under Goldman Sachs that it was their burden to disprove price impact. All right? They saw our opening, our class certification briefing. But is it true that your expert didn't focus on this at the opening briefs? Our expert in the opening briefs, his— They're basically trying to anticipate what's coming. You come out with them with something else. Well, you know— They're allowed to, but then they get a chance, don't they? Our expert, for them, he flagged it. There's an original event study in the record at record page 2698, paragraph 44. As part of his market efficiency analysis, he did an event study. And in that paragraph, he addressed the fifth camera factor, whether or not we could expect to see the stock price react to certain events and certain negative events. He did a sort of what I would call a miniature event study of Anadarko's stock price and how it reacted to the news. It wasn't our burden. He did it. The only thing he did on reply was plug in the new Colorado peer group that the defendants themselves had constructed in their opposition. So I wouldn't say it's new in that sense of form. It's new that it did not exist before, but as the judge found, it was completely responsive to their opposition argument. You keep mentioning that it's their burden. Does it really matter whose burden it is from the standpoint of the opportunity to be responsive? I think it does. For example, here, I know counsel said, well, in the class cert context, when we come forward and try to carry our burden, that's really sort of like the first brief on the issue, and therefore, we should get the last word. Well, that would completely swallow the entire rule against cert replies. Yeah, no, I think I agree with you there. But I guess to me, it's whoever has the burden on any, you know, there are lots of elements, there are lots of defenses, people have burdens on different things, presumptions shift, et cetera, et cetera. But the point is, you're supposed to have a clashing of ideas, a clashing. A clash of ideas. The adversarial process. In the summary judgment context, they would come forward. The question is whether the adversarial process was completed at this stage. I guess that's the question before us. Yes. And we believe it was. You know, the bottom line is, as Goldman Sachs requires, the district court used common sense and considered all the probative evidence to correctly conclude that a $900 million write-off that moved the stock 4.1 percent, even before there was any mention of this other firestone event, you could not attribute every portion of the 8 percent stock drop the following day solely to that firestone event. And the defendants thus failed to disprove price impact. And we would ask the Court to affirm that discretionary decision. Thank you. Mr. Orsini, you have five minutes. Yes. Thank you, Your Honor. May it please the Court, a couple of factual points, quickly. With respect to the timeline of the press release. So you can find it at record site 3465. The tweet that went out at 4.03 was a tweet from ABC News saying that officials are providing, well, it starts with, in all caps, WATCH LIVE. Officials are providing an update on last month's... So it was available live. It was available live. And we know that because we see Denver 7 News, for example, tweet at 4.11 that it was a firestone home explosion that caused it. The cause has been disclosed as a cut oil line. So you could watch it live. People were watching live. It was being tweeted. I stand by what I said earlier, which is I can't tell you that Goldman Sachs then traded on it, but it was absolutely available. And the link said WATCH LIVE. That's factual point number one. Factual point number two. The Daubert motion was not filed two months later. It was filed one week after the Court denied our Sir reply. I don't know if that matters, but I just wanted to clear that up. Judge Ho, you said the point here is there's supposed to be a clashing of ideas. And that's what didn't happen. That's what didn't happen. I fundamentally disagree with most of what counsel said very eloquently about why it was Shen, why it wasn't Shen, why it was Firestone, why it wasn't. That's what the court... You guys will fight about that below. Exactly right, Your Honor. As you said in the last argument, I would love reversal, but it's hard for me to stand up here and say it wasn't considered below, so now decide it for us. These are fundamental disagreements about what they put in for the first time on reply. New is new, right? The evidence didn't exist. The arguments didn't exist. The analyses didn't exist when we filed our opposition brief. We provided extensive responses to it in the Sir reply, which the court... I'm sorry, in the Daubert motion, which the court granted class cert, relying on their reply expert's view of what that evidence shows. And that's the debate we have to have below, both with respect to class certification and, Your Honors, with respect to the Daubert motion itself. Because, you know, I'd submit under Prantel, we didn't have the full-fledged Daubert analysis. If you look at the court's decision on the Daubert issue, it's very perfunctory. It starts by essentially chastising us for the Sir reply, very similar to what the court in Prantel wrote, where the court said, not clear I need to deal with Daubert at class cert, does a bit of a perfunctory analysis, and what this court said was, no, full-bore analysis. And, look... Just briefly, I'm pulling up your brief. To go back to your discussion of the tweet... Yes. Is that in your opening brief? I'm looking at page 43. You refer to the 403 announcement of a press conference. So, what, if you go to record site 3465, I don't know if we called this specific point out, or 3485. 3485, yeah. Yeah, I'm not sure if we specifically... In fairness, you do... We cite to that. Oh, and we say watch live, right? So, in our brief, is this our opening brief? That's what I'm not seeing. It's definitely in my reply brief, Your Honor. In real time. Yeah, in the reply brief, I think that is what we meant in our reply brief. On page 18, there is that record site to 3485 in the quote of watch live. But note 16 does say watch live in the ROA site. Correct. Exactly, Your Honor. And so, I just think the last point I'd make here is, you know, we're obviously not advocating for a rule that we always get served replies in every case. What we're advocating for is that clashing of ideas, and I think that clashing of ideas is going to be particularly important in these securities litigations, in this CERT context. You know, the courts over the last 20 years have moved from Class CERT sort of being a rubber stamp, and this court was at the forefront of that, to actually engaging with the evidence, actually engaging with the analyses, actually making findings. And there will be circumstances in that context where, to get that clashing of ideas, you need a hearing, you need a Daubert brief, or in this instance, you need a reply. Thank you, Your Honors. Sir, reply. Sir, reply, yes. Thank you. Thank you. The case is submitted.